call the case. You want to step up and identify yourselves. Pete Scrove with the opponent Eugene Wright. Assistant State's Attorney Sam Ray on behalf of the people of the state of Illinois. You basically know our procedures so it's 15 and 15 if there's a lot of questions we'll give you some leeway but don't repeat yourself 5,000 times as one attorney last week did and went on until we had to finally just shut him down. Good morning may it please the court. My name is Pete Scrove for the appellant Eugene Wright. I will try not to repeat myself. With your permission I would like to start briefly with the pro se admonishments issue before I move on to the other issues relating to the firearm element. In this case it is uncontested that Mr. Wright was twice misinformed of the actual sentencing range before he waived his counsel or when he waived his counsel, right to counsel. He only learned of the correct range when he actually went to sentencing. This was a violation of Supreme Court Rule 401A. The state contends that it was either substantial compliance or he wasn't prejudiced by it for a couple of reasons that I think missed the mark. One is the state says well he only got 50 years and he was admonished about 60 so therefore there's no prejudice. But I think that's incorrect for a couple reasons. One is the sentence that you get is dependent upon the sentence range you face. So for instance if a judge misapprehends the sentencing range and still sentences it dependent to the correct to a sentence that's in the actual range, it will still be remanded because the judge needs to know the actual range to make a correct decision. How is he prejudiced? Because I think this, like I said, if a judge sentences you to the right sentence or a correct sentence but misapprehends the range, it's still going to be remanded. In this case... I can only see that happening in almost the reversal of your case where there's potential for an extended term and he doesn't admonish and then grants it. Or in a case where it's 85 and 50 percent and a judge doesn't realize it's 85 and he just goes and says it's 50 and then he sentences him right on the line and then the question, just the opposite of yours, is would he have changed it if he had known the guy had 85 percent? In your case, there's no possibility of this happening because he sentenced him within and the basic case law says if you are within, no harm, no foul. Well, I don't think that in any of the cases the state cited, with the exception of possibly Ray, but I think Ray's an outlier, actually stand for that. This is a misstating of the maximum. So for instance, if a judge thinks that a defendant is class X eligible and sentences him to seven years and then finds out he was only class one, that doesn't change, but they're going to remand it because who knows if the judge would have given him the same sentence had he known that he was actually eligible for three to seven, which to me is the same instance here. So he gets 50 years, which is a lot more than the minimum sentence, well over double the minimum sentence. So if the judge had, you know, could have been based on the fact that he thought he was eligible for a maximum of 75. So that's why I think that there still is prejudice in this case, even though he was sentenced to less than he was admonished, because the sentence that was imposed was based on the sentence range he actually faced. If there are no more questions, I'd like to move on to the grand jury issue. Let me ask you this. There was also contention that there was an improper admonishment post-trial. Sure. And I think you made the point that the state's attorney's office had not addressed that in their brief, so obviously I want to hear from them, but would your position be that if the only faulty admonishment was post- conviction but pre-sentencing, that the remedy would simply be a resentencing or would you still be arguing for a new trial on liability? I believe if that was the only error, then it would be for a new sentencing here. But since here he had, there was, he was never given the correct range till sentencing. So I don't think the second admonishments cure the error of the first admonishments. Was there any waiver with respect to the admonishments at sentencing? Is there any waiver? Was he, sorry. Oh, go ahead. Did the defendant abandon the issue with respect to a ruling on his interest in having counsel? Well, he proceeded pro se. I mean at that point I don't know, you know, I think it's, the right to counsel is fundamental, so I don't think without being properly informed of the known waiver of that right, it still could be reviewed as under plain error or a substantial right here that was violated by not ensuring that his waiver of counsel was knowing and voluntary. Go ahead. With regards to the grand jury issue, I think we need to look at what Detective Lee knew at the time he testified in front of the grand jury. He knew that Mr. Morgan, the co-defendant, had pulled up his shirt and revealed the butt of the gun. He knew that Mr. Morgan came out. It was a short chase. He ran south from the Baker Square. He turned on to Estes. He ran down an alley and was tackled somewhere on Greenleaf. So they knew he had the gun and when he was arrested he didn't have it on him, so they knew he had to abandon it somewhere along that path. A week later, actually, Detective Lee interviews Mr. Morgan the next day and Mr. Morgan says, yeah, I used a BB gun. So about six days later, when the snow melts, and if you looked at the video there was a lot of snow on the ground at the time of this occurrence, someone calls in, there's a BB gun that's on the path where Mr. Morgan fled. So when Mr. Lee testifies to the grand jury, he says, yeah, a handgun was used in this Yes. Was it ever recovered? No. I think that was deceptive or misleading or inaccurate testimony that led to an indictment on the element of a firearm that's similar to what happened in People v. Oliver, which requires that that account be dismissed. For instance, in People v. Oliver, you had an officer testify to the grand jury and saying, yeah, I witnessed a couple hand-to-hand transactions. From the hand-to-hand transactions, it may have led me to believe it was cocaine. And so when defense counsel realized that this officer hadn't witnessed it, and the officer who had said he couldn't tell from the hand-to-hand what it was, he moved to dismiss the indictment on those two counts that had the element of intent to deliver, because the basis for the intent to deliver was supported by the testimony relating to hand-to-hand transactions, which was misleading testimony to the grand jury. It was outright false testimony in Oliver, right? I mean, it was flat, flatly false. I mean, can you say the same of this testimony? Well, I think it's pretty close to outright false testimony. I mean, there's, well, there's no, no one has ever been able to conclusively tie that BB gun to Mr. Morgan, right? A BB gun was found, and he didn't mention that to the grand jury. Exactly. But I think, I mean, it's very hard to feel this is not relevant information that the grand jury should have had. And the idea that this didn't have fingerprints on it, I mean, Mr. Lee, when they found this gun, he thought, he got it, he inventoried it because he thought it would be the gun involved. The lack of fingerprints, I think, is not very relevant in this case. As, like, people V. Johnson cited where they recovered a gun a couple days later, where they thought the defendant might have discarded a gun. There's no claim that that gun couldn't be tied to the defendant because there's no proof. And not giving the grand jury exculpatory information. There is a line somewhere there. There is a line, yes. I don't think that this is an example of just simply not giving exculpatory information. I think this is misleading the grand jury. When you say, was a weapon recovered? No. I mean, that's, they recovered a weapon in this investigation. It was inventoried under this case number. I mean, they thought that this was involved. And I think it was very convenient to just leave that out so then you can indict on armed robbery with a firearm, which is, you know, has a much greater sentence. Counsel, is it your position that there was not enough evidence presented to the grand jury for them to issue a true bill with respect to the armed robbery count? Did we have some evidence? I believe that there is some evidence, but I believe, just as in people like Oliver, like, he was found with a certain, enough drugs that possibly could have supported an indictment. But the problem is when you mislead, it becomes a due process violation. And I don't think it would have been difficult or anything to just say, we found a BB gun, no prints were on it, and then let the grand jury do its job, which is to determine what offense should be indicted on. I mean, this was maybe a sin of omission, but I think this is a pretty big omission. And I think it's a pretty big coincidence to just say, well, there's no fingerprints. I mean, I remember we were trying to argue, well, if this had been a real gun and I was trying to argue, oh, the state didn't prove his case because there's no fingerprints, I don't think I would get very far because I very rarely see fingerprints on handguns. Which gets me to the next issue, which is I don't believe the state proved the firearm element in this case beyond a reasonable doubt. Armed robbery with a firearm is a distinct crime from other armed robberies and other robberies. The state has the burden of proving every element. Now, in this case, the proving of that element came down to three people who briefly saw the butt of something in Mr. Morgan's waistband. And the state has cited cases like Washington and Malone and Toy, and those cases are all cases where witness testimony was held to be sufficient. But I don't think those cases go as far as the state says. I don't think that any witness testimony, no matter what that testimony is, is always sufficient. And in this case, to just briefly see the butt, it's unlike Malone or Washington or Toy, where they saw the whole gun, pulled it out, pointed it at him, had an opportunity to view. I don't even think a firearm expert would have been able to tell from a brief view of someone lifting up and seeing the butt of a gun whether that was an actual firearm or a BB gun or whatever. So I think that what's the even bigger distinguishing factor here is that they found a BB gun. I think that takes this as another element that completely distinguishes it from any of the cases the state relied on. I think it's kind of hard to believe when we know Mr. Morgan had the gun. We know he disposed of it on a path. We know there was snow on the ground, which is why the officer said he couldn't find the gun. And then they find the BB gun. I mean, I think that's a little bit too big of a coincidence to just say, oh, there's no way that this was the gun. I mean, my position is that even if they hadn't found this BB gun, there wasn't enough evidence to convict on this element. But when you add that in, I think that this case is pretty clear. How much evidence, counsel, did the jury hear about the BB gun? It wasn't clear to me from the briefs, from what I've read of the record. Well, what did come in was that detective pictures were introduced. Right. You showed them to Perez. Yes. Okay. Did you show them to any of the other witnesses? I don't know if you showed the pictures. Detective Lee, I might have been shown. Detective Lee did testify that a BB gun was recovered and that it was on the path that Mr. Morgan ran down. So that's basically what the jury heard, which I think gets me to my next issue. Can I just ask, did the defendant argue in closing on this issue? I do not believe he did. I don't think he did. He argued more that he was, you know, not present at the scene. Why did the defense counsel not admit the BB gun? Or let me rephrase that. Wouldn't it have been assistive to him if he had? I think it would have been beneficial. He did get the photographs in. And if you saw a photograph, you can get a good sense of what this gun looked like. You know, he didn't get these photographs from the state's attorney in this case. They were disclosed to him from the state's attorney who was representing him, or prosecuting him on another case. And I don't know if that had something to do with, you know. And he went pro se, which I realize, I'm not arguing ineffective assistance or anything like that. But he, perhaps a competent counsel would have introduced it. But I think we do know that the jury did hear about the BB gun, where it was found, the nature of it, what it looked like. But that gives me to my next issue, which is one of the things that the jury didn't hear, which was Mr. Morgan, when he was arrested, told Detective Lee, I used a BB gun. And I think this was admissible, basically because this was a statement against his penal interests. It was reliable. It was corroborated. And it was necessary for Mr. Wright's defense on the firearm element of armed robbery. But wouldn't it have been also helpful to both of them by saying it's a BB gun? Or let's play murder mystery. We put the gun out there after the crime so that now we can reduce our charge from armed to a BB gun. And then we've got this issue, but we really can't say that it was ever really there, other than what he says. So now he's reducing the potential for what he can be charged with. So is it really against him? I think it is, Your Honor. I get what you're saying. I don't think either one of these, they were both in lockups. I don't think they could have done that. But in a sense, yes. When he said it was a BB gun, there was an attempt there to lessen his culpability. But in like People v. Tenney, the declarant was taking part in a home invasion or a robbery. But he tried to say, oh, but it was another person who shot it, shot the victim. But it still was coming in because that statement was against his penal interest. And just as Mr. Morgan's statement, even though he may have tried to limit his culpability by saying things like, I was poor, I was homeless, I didn't have money, and it was a BB gun, he was still admitting to a crime, a serious crime, aggravated robbery, robbery, possibly armed robbery, if they'd introduced the bludgeon. So I think if you look at Tenney, it's not, it doesn't even have to be a confession. But if it exposes the declarant to liability, then it's a statement against penal interest. And I think this clearly exposed Mr. Morgan to liability. And if you look at- Counsel, does 804 allow you to parse the statement, to take portions of the statement which might have been clearly against penal interest and parse out those portions that were simply stated for purposes of diminishing culpability? Well, you know, Your Honor, I think that in some circumstances that would probably allow it. I'm not positive about that specifically. I mean, I think oftentimes statements are portion, redacted or whatever. Sometimes the part of a confession will be inadmissible and some will be admissible and they'll redact it. I will say that Mr. Wright realized that this statement would also be harmful to him, and he still wanted it admitted. And he was willing to take that chance because I think the firearm element was crucial in this case. I think if you look at people v. Gray, people v. Anderson, people v. Coccaralli, one of the things they say is, if the statement could be used against the declarant in a case, then the defendant should be able to use it against, in his case. And I think in this case it would be clear that Mr. Morgan, the statement that he made to Detective Lee, could be used against him. So I think that that means it meets the requirements to be admissible in Mr. Wright's case. And I think it was corroborated, which is another factor that courts look to, because he said it was a BB gun. They found a BB gun in the path where he, you know, had ran. And I think also it was very necessary to Mr. Wright's defense on this element. So I think of all the chambers, and Illinois Law analyzing chambers, were met in this case. And it was error to not admit it. It was prejudicial error, especially on that element. So with the last issue, if I could briefly get to, I just would like to say that the, I believe the trial court had a duty here to sui sponte, instruct the jury on the elements, and the definition of a firearm, and the exclusion of a BB gun from that. 1835G is a pattern instruction. It defines firearm, and it says, where appropriate, put in the exception, a BB gun is one of the exceptions. In a case where there's an element that's contested, the definition is required to be given, and the exception needed to be given in this case. And I think if, you know, people read Delgado, it's plain error, it's reversible. So I think it was also error to not sui sponte, instruct the jury on the definition and the exclusion of a BB gun in this case. Did the instruction on robbery have any curative effect? I think it might have, but I think it didn't really, without the jury knowing that if BB gun is not included in that definition, it didn't have the, enough of a curative effect, I don't think it, without giving them the proper definition, I don't think the robbery instruction cured the So if there are no further questions, if I would have a couple of minutes in rebuttal. Thank you. Thank you. Good morning, your honors. May it please the court. Assistant State's Attorney Sam Ray on behalf of the people of the state of Illinois. On December 26, 2010, Defendant Eugene Wright, along with co-defendant Michael Morgan, entered the Baker Square located at Tui and Western in Chicago and committed armed robbery with a firearm. Following defendant's pro se jury trial, defendant was convicted of armed robbery and sentenced to 50 years in the Illinois Department of Corrections. As to defendant's first issue, defendant's admonishments complied with requirements of Rule 401A and defendant was not prejudiced by these admonishments because he was sentenced to only 50 years. Well under his. If we would adopt that position, does that mean that in any case or in every case, as long as the sentence imposes within the sentencing range, we must and we can conclude no prejudice? Is that the rule? That is the rule as far as the case law goes so far. As articulated in people of the URA, with a trial court admonished defendant that he would have to serve, excuse me, the trial court admonished defendant that is in the sentencing range was three or seven years. However, the trial court failed to tell defendant that he was eligible for an extended term of 14 years. Defendant was convicted and sentenced to only three years. The appellate court found no reversible error because no extended term was imposed. Thus, defendant was obviously not prejudiced by the lack of admonishments. The converse rule was applied in People v. Bars and People v. Koch. In both of these cases, defendant was improperly admonished, then defendant was sentenced in excess of the sentencing range. The court, specifically in Koch, held that when a defendant is given a sentence in excess of the maximum that he was informed at, at the time he went to counsel, then the waiver is not valid. Here, defendant was sentenced, was admonished that he could be sentenced to 60 years. He was only sentenced to 50. Therefore, there was no prejudice. Can I move on to the re-admonishments? And can you respond to his statements regarding, well, I guess what I'd say is the continuing waiver rule. I'm a little confused by that. Yes, Your Honor. Under the continuing waiver rule, the trial court was not required to re-admonish defendant for the post-trial phase of his proceedings. Under the continuing waiver rule, when the defendant makes a valid waiver of counsel, this waiver remains valid throughout his proceedings, unless the defendant later requests counsel or other circumstances, such as lengthy delays between the trial stages, suggest that waiver is limited to defendant neither requested counsel nor was there a substantial delay. Did the trial judge re-admonish him between the finding of the guilty and sentencing? From my recall, he did request to, or he did ask him if he still wanted to go on on his own. The trial court simply asked the defendant if he wished to continue to represent himself during the trial, and the trial court replied that he did. There was no, it's a people's position, there was no re-admonishment here. What about his filing of the document that said he wanted counsel? The defendant did file a motion with the clerk requesting assistance for the preparation of his post-trial motions. However, he never brought this motion to the attention of the trial court. Did he serve the people with that motion? It's unclear. The motion is in the court file, and it's in the appellate record. However, under Illinois law, to properly put a motion before the court, it's not enough to file that motion. Instead, it's the defendant's responsibility to request the trial court to rule on it. Is there any indication in the record that the people were aware that the defendant was trying to get a lawyer? There is no indication. The only time this motion is mentioned in the record is in the common law record from when it made the court file, and it was sent by the clerk of the court. But even prior to that and post that, my understanding from the record is that the trial judge asked him more than once if he wanted counsel, and he said no in kind of a favorable way of, you know, I don't know what sort of language he is, but I remember reading it, and I thought, oh, isn't this huge? You're saying, I don't need one. I'm great. So, in that effect. Immediately after being found guilty, the trial court asked the defendant if he wished to continue to represent himself on first post-trial proceedings. He indicated that he did. There was no re-admonishments, and under the continuing waiver rule, no re-admonishments were required. Was it at the point in sentencing where the trial judge ultimately indicated to the defendant that the correct sentencing range had a The trial court never informed the defendant that the sentencing range The trial court never addressed the fact that the sentencing range was, in fact, 75 years. The only time that sentencing range was mentioned was during the people's argument and aggravation, just before the trial court opposed it. So only the people indicated that the sentencing range was 75? Correct. The trial judge never indicated that it was 75? The trial judge never indicated it was 75, and only mentioned that he would be sentencing the defendant to 50 years. But after the trial, when the judge did ask him again, do you want to represent yourself, do you want to continue pro se, you argue the judge did not have to do another admonishment, but he certainly at least began to admonish. What do you say of a situation where even if the trial court isn't necessarily required to re-admonish, they in fact go ahead and do it, and do it wrong? It's the people's position that there were no re-admonishments here. The trial court simply asked the defendant, if you wish to continue to represent himself, he said yes, and they moved on. So as to the first issue, the trial court's admonishments were not prejudicial, and the trial court was not required to re-admonish the defendant for the post-trial phases of this proceedings. As to moving on to the grand jury issue, the trial court properly denied the defendant's motion to dismiss the indictment because Detective Lee's testimony at the grand jury was truthful that the co-defendant's handgun, which he used in the armed robbery, had never been recovered. Did the trial judge misperceive the testimony at the grand jury? It's unclear from the record. There is some indication that he believed that the detective testified that no gun was found that night. The detective testified that a handgun was used and the handgun had never been recovered. A defendant only suffers a due process violation where the prosecutor deliberately or intentionally misleads the grand jury, uses false or perjured testimony, or presents deceptive or inaccurate evidence. Does it matter whether it's intentional or not? I believe it does not. To dismiss an indictment, the denial of due process must be unequivocally clear and the defendant must suffer actual and substantial prejudice. Defendant has the burden of showing this prejudice. In this case, Detective Lee's statement was accurate. Detective Lee testified truthfully in the grand jury that co-defendant was armed with a handgun during the armed robbery and his handgun had not been recovered. This statement was supported by the evidence at trial. At trial, three eyewitnesses testified clearly and credibly that co-defendant was armed with a firearm. In turn, the evidence connecting the BB gun to this case was tenuous at best. The BB gun was recovered one week after the crime in the vicinity of where one of the offenders fled. There was no forensic evidence linking the BB gun to the armed robbery. Had the people been able to connect this BB gun to the crime, perhaps they would have charged the defendant under a different form of robbery. However, the tenuous evidence connecting the BB gun to the armed robbery was not enough to cast doubt in the credible testimony of three eyewitnesses that defendant was armed with an actual firearm. As such, the people's position now and was the people's position at the time of trial and at the time that Detective Lee testified in the grand jury, that co-defendant was armed with a firearm and this firearm had never been recovered. Therefore, this firearm was at best a piece of exculpatory evidence. The people are not required to present exculpatory evidence in the grand jury. In fact, the notion that people are required to present exculpatory evidence in the grand jury has been explicitly reducted by the Supreme Court of the United States and United States v. Williams, which held that requiring a prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historic role, transforming it from an accusatory into an adjudicatory body. Here, requiring the people- Also, is there a difference between not volunteering a piece of information and answering a question about a piece of information in a misleading fashion? Well, misleading the grand jury would amount to a due process violation. But here, the grand jury was not misled. Co-defendant used a handgun in this armed robbery and the handgun had never been recovered. Requiring the people to present evidence of this handgun, of the BB gun, would require the people then to present evidence of every eyewitness who saw the firearm. This would create a preliminary trial and  In addition, defendant cannot meet a burden of showing actual and substantial prejudice from detective Lee's grand jury testimony. The Illinois Power Court has held where there's enough evidence to convict a defendant, there's clearly enough evidence to indict a defendant. Here, at trial, the jury heard evidence of the BB gun. And they could have convicted defendant of robbery, but they chose to find credible the testimony of the three eyewitnesses who testified that it was a firearm and convicted defendant of armed robbery instead. Therefore, there was no prejudice here. Was Detective Lee asked in the grand jury proceedings whether or not the defendant had an opportunity, the co-defendant had an opportunity to discard the gun? He was. And his answer to that inquiry was in the affirmative, or yes, I believe. Correct, Your Honor. And subsequently, he then responds that there was no gun recovered. Would not the inquiry with respect to the opportunity to discard have led to a response that included some discovery of the BB gun? I believe not. And Detective Lee was asked, has co-defendant's handgun been recovered? And he answered no. As to the reasonable doubt issue, considering the evidence presented during defendant's jury trial in the light most favorable of the prosecution, any rational trial fact could certainly have found the defendant guilty of armed robbery or the fire. It's not the function of the reviewing court to retry the defendant. Instead, the relevant inquiry is whether the evidence presented in the light most favorable of the prosecution, any rational trial fact could have found essential elements of the crime beyond a reasonable doubt. Under Illinois law, a firearm need not be recovered, nor a victim be shot, to establish that co-defendant was armed with a firearm. In fact, in People v. Toy, this court held that evidence of a dangerous weapon may be established through circumstantial evidence, and an armed robbery conviction can be upheld, even if the weapon was not seen accurately or accurately described by the victims. Initially, defendant presented an alibi defense at trial. And during the jury instruction conference, defendant objected to the jury receiving a robbery instruction. In closing, defendant asked for an all or nothing verdict. During defendant's post-trial motion, he renewed his objection to the robbery instruction. Thus, the verdict that defendant now claims that the jury should have reached. Wait a minute, did I, I'm sorry, did I hear you say the defendant did not want the robbery instruction given? Correct, defendant objected to the robbery instruction during the jury instruction conference and renewed his objection to the robbery instruction in his post-trial motion. Therefore, the the verdict that defendant now claims the jury should have reached. He didn't argue for a trial and objected to the jury even being able to consider. Next, the jury heard substantial evidence in support of the armed robbery conviction. At trial, three witness, three witnesses testified unequivocally that the defendant was armed with a firearm. Martin testified that he had experience with firearms. That he saw co-defendant pull up his shirt at the counter. And co-defendant showed the handle of a firearm tucked in his waistband to Martin. Martin testified that he saw the whole handle of the firearm and described the firearm as a black automatic black gun. Additionally, co-defendant brandished the firearm. Martin testified that he felt the barrel of the firearm pressed into his back as co-defendant led him to the office at gunpoint. Martin again saw the firearm when co-defendant pulled up his shirt and threatened one of the servers by displaying his firearm. And when Perez was asked whether the gun could have been this BB gun that was in the photograph, his answer was it was inconclusive, that the photo was too blurry, is that what he said? Martin was showed photos of the BB gun. He testified that the picture is blurry, I couldn't tell. Martin, however, during- Have you looked at these photos of the BB gun? I have seen the photos. Does that look like a handgun to you? Or a BB gun? It's hard to tell these days. Martin testified, however, Martin testified at trial that he was 100% sure that co-defendant's gun was an actual firearm and that it looked like a semi-automatic pistol. Martin's testimony was corroborated by the testimony of one of the servers, Michael, who testified that he had experience with guns and that he saw the co-defendant threatening the other server with a firearm that he believed to be a 9mm gun. Sege, the other server, also testified that co-defendant pulled up his shirt and showed her the handle of his firearm tucked into his waistband. This court has reached a similar conclusion to Peabody-Malone. In Malone, defendant was convicted of armed robbery after he pulled out a firearm and placed it on the counter and forced the cashier to open up a register and then remove money. At trial, the cashier described the gun as a black or black and silver gun. Based on this testimony, this court upheld defendant's conviction of armed robbery with a firearm. In turn, the evidence connecting the BB gun at trial was tenuous. The jury heard evidence of the BB gun during the cross-examination of Detective Lee. When Detective Lee testified that a BB gun was found by a citizen lying on the street in the vicinity of where one of the offenders was running. This evidence was recovered by an evidence tech. Detective Lee never actually saw this BB gun, but he had it sent to the crime lab to be analyzed for fingerprints. At this point, defendant tried to enter photos of the gun, but was unable to do so because Detective Lee couldn't lay a foundation for the photos. The jury also heard evidence of the BB gun during a direct examination of Martin Perez during defendant's case in chief. That's when defendant showed photos of the BB gun to Martin, and Martin was not able to conclusively tell whether that was the gun, stating the picture was blurry or couldn't tell. That wasn't really evidence of a BB gun then, was it? Correct. It was, the BB gun was mentioned, but anything connecting it to the present case was tenuous. Therefore, viewing this evidence in the light most favorable to the people, considering the substantial evidence testimony that the grand jury heard regarding the BB gun, a reasonable jury surely could convict the defendant of armed robbery, as they did here. As to the fourth issue, the trial court properly precluded defendant's inadmissible hearsay statements to Detective Lee from evidence, because defendant failed to establish co-defendant's unavailability prior to offering this evidence. Initially, this issue was forfeited. Counsel, in the reply brief, I think it was, the defense made the argument that before the trial began, Morgan's attorney informed the court, the defendant and the state's attorney in open court, that his client would take the fifth of call to testify. Is that, is that your reading of the record? That is correct. Well, then how can you say that he wasn't unavailable? During, during the sidebar held during the defendant's cross-examination of Detective Lee, the defendant proffered to the court that he was seeking to admit evidence that co-defendant told Detective Lee that he, quote, did the crime with the BB gun. However, he acknowledged that he would need to call the actual person because it was hearsay. The prosecutor agreed with the statement and stated, if he's gonna call him to testify, he's referring to co-defendant. The court concurred with both of these statements, stating, you've gotta get that from co-defendant, not from the detective. It's clear that at the time of the sidebar during trial, no one was aware that co-defendant was gonna exercise his fifth amendment right. I'm sorry, did, as I understood what the defense argued in the reply brief, he said before the trial began, Mr. Morgan will take the fifth of call to testify. Correct. Okay, so that happened before this sidebar that you're talking about. Correct. So at the time of this sidebar, it's already been established that Mr. Morgan is not going to testify. And the judge even said at some point during, around the time that we're talking about in the trial, I'm not gonna let you call Mr. Morgan just so the jury can see him take the fifth. The- So what more does the defense have to do to establish unavailability? This, this colloquy that occurred prior to trial, at least could have been proffered by defendants time to lay a foundation to establish the, the threshold requirement for 804B3. In addition, the defendant had ample opportunity to admit this statement during his direct, he could have called Detective Lee to testify to the statement. Moreover, detect, he did call Detective Lynch, who was also present for co-defendant's statement to testify, and didn't ask him about the BB gun. It's the state's position that the proper procedure for admitting the statement under 804B3 would be to establish his unavailability, as in when co-defendant took the fifth during trial. And then introduce the evidence once the threshold requirement has been established. Who did he try to get the evidence through? Who did, who, who's, who was testifying when the defendant tried to put in this statement? Detective Lee during cross-examination during the Peoples case. So he could have recalled Lee. Absolutely, he could have recalled Lee, and in fact, he called Detective Lynch to the stand, who was present for the statement and could have testified. But he didn't ask him the question. Did not ask him about this. In addition, not only was the threshold requirement, it's the people's position that since the threshold requirement was not established, the trial court never actually conducted an 804B3 analysis. There was no need to do so. This was a threshold issue. It was as simple as the fact that co-defendant had not yet become unavailable. And that was that, because to even move on to 804B3 analysis, co-defendant has to be unavailable first. In addition, even if co-defendant had been unavailable or the defendant had properly admitted this statement through the testimony of Detective Lee or Detective Lynch, it would not have been an abuse of discretion for the trial court to exclude these statements and find that these were not statements against penal interest. Under Chambers, a statement, excuse me, under Williamson versus the United States, a US Supreme Court case, the Supreme Court found that a court cannot just assume for the purposes of Rule 804B3 that a statement is self-inculpatory because it's part of a fuller confession. And ultimately, this whole analysis on these hearsay rules is about whether there's some additional reliability, right? Correct. Our Supreme Court has said that repeatedly, right? And I don't think that changed when the Supreme Court codified the rules of evidence to you. It's not 2011, it did change. Yeah. It changed what is admissible under hearsay. Substantially limiting what was considered here. Sure. Prior to 804B3, a statement against interest could come in if the, I believe if the defendant was, or if the declarant was available. But 804B3 introduced a requirement that the declarant must be unavailable. In Williamson versus United States, the co-defendant was arrested for possession of cocaine following a traffic stop and further implicated the defendant. The co-defendant refused to testify at trial, so the agent who interviewed the co-defendant testified to the co-defendant's statements. The Supreme Court held that not all of co-defendant's statements were admissible as statements against interest. Because while parts of his statement were self-inculpatory, other parts of his statement did little to subject the co-defendant to liability. Going back to my mystery, I have difficulty seeing that the issue of the BB gun is nothing more than an opportunity to reduce your crime to robbery from aggravating. You're absolutely correct. In fact, in Williamson, the court stated that in regards to the co-defendant's statements, a reasonable person in co-defendant's position might even think that anything to someone else would decrease his practical exposure to criminal liability, at least as far as sentencing goes. The same thing happened in this case. The co-defendant was caught red-handed, essentially committing an armed robbery. He was caught moments after the armed robbery with proceeds of the armed robbery. A reasonable person in his position would certainly think that saying something like I committed this crime with a BB gun would limit his exposure to criminal liability, at least as far as sentencing goes. Now, here we have a homeless individual or someone who's alleged to be homeless and he's just out and the defendant picks him up and forces him to do this. Which suggests to us that perhaps this isn't an individual who is well versed in the law or who has any understanding about lesser included offenses or elements for an offense, what's necessary for the state to prove armed robbery versus robbery. How is it we can conclude that in this co-defendant's statement with respect to his participation in the robbery and use of the BB gun was for the purpose of really just diminishing the crime as it was charged against him? I believe this co-defendant stated in his statement that he had committed robberies before and I think it's a reasonable claim to say that he likely knew that committing a crime with an actual firearm is more serious than committing a crime with a BB gun. But in light of subsequent events over the next week, wouldn't you agree that there's a pretty good dish of reliability that you would assign to this statement? When this guy is arrested, he runs, the police can pretty much trace his route. They catch him, they bring him back to the station. At that point when they're back at the station questioning him, there's no talk of a BB gun. No one's found a BB gun. In fact, the only evidence they do have is what the people at the restaurant have said, which is maybe it's an automatic weapon, maybe it's a 9mm. But this co-defendant, Mr. Morgan, says I used a BB gun. And lo and behold, a week later, once the snow has melted, they find that, I'm not saying it's that BB gun, but a BB gun that looks a lot like an automatic weapon right in the path. You know he tossed the weapon and there you find it in the path. I acknowledge that nobody has been able to conclusively tie that gun to Mr. Morgan, but that's not the standard when we consider reliability. You don't have to show absolute certainty, right? I mean, doesn't that chain of information tend to suggest that what Mr. Morgan was saying was true? And isn't ultimately that what we're trying to get at? Was this a reliable statement? The BB gun found a week later certainly somewhat corroborates the co-defendant's statement. Though he didn't say where exactly through the BB gun. In addition, that's a pretty big coincidence if he just came out of the blue and made up a BB gun when he was under questioning. And the BB gun that was discovered is outweighed by the substantial testimony of the three eyewitnesses who said that this gun was committed with an actual fire. But the heart of this issue is really that co-defendant was not unavailable at the time he made the statement. So this is all speculation because the trial court would have never actually made this analysis. He wouldn't have got as far as we did. He would have ended his analysis at the fact that co-defendant was unavailable. Putting all of that aside and putting the BB gun out the window, you have witnesses that outweigh all of that consideration of the BB gun. It's almost like the BB gun is a red flag tossed in there to try and muddy the waters. Absolutely correct. The jury heard substantial evidence from these three eyewitnesses. And every eyewitness corroborated each other. And the other interesting thing is if there was doubt in the witnesses, I would have found him guilty of robbery. Obviously, they were convinced substantially more so than not that that was a real weapon. And that therefore, I mean, they had their door and their out. And even the state did argue that you could convict him of robbery only. Or in the alternative. The state stated in closing that if you believe co-defendant's gun to be a, let me get the actual statement. If you're not convinced beyond a reasonable doubt this is in fact a real firearm, that's why the robbery count is there. The jury certainly could have convicted the offender of robbery, but they chose to believe the credible testimony of the three eyewitnesses. So as to the fourth issue, the trial court probably included these statements because co-defendant was not available at the time defendant tried to introduce the statements. As to the fifth issue, the trial court was not required to respond to issue instruction on the definition of firearm because firearm was not an element of the offense. Defendant concedes that this issue is not preserved for review. And under a plain error analysis, no plain error occurred because there simply was no error at all. If neither party requests an instruction, the trial court is only required to suspend to issue instruction if it concerns elements of the crime charge, the presumption of innocence, or the burden of proof. What is the case that states that if it was not raised by the defendant at the time of trial, it cannot be raised on appeal? Excuse me? There's a question as to whether the jury instruction can even be challenged at this level because it was not challenged by the defendant. I believe that has to be, under the standard, has to be grave error, which has, they do the same, the appellate court has interpreted this the same way as a plain error analysis. In contrast to an element of a crime charge, Illinois courts have routinely held that terms within instructions which are employed in a general, non-technical context need not be defined. The trial court's decision not to suspend to issue instruction is subject to an abusive discretion review. Moreover, juries are presumed to know the ordinary meaning of words, especially words within the general lexicon and common vernacular, such as firearm. Here there was no error, first because neither party requested the instruction and the definition of firearm is not an element of armed robbery, but rather a non-technical term that does not require to respond to instruction. Firearm is a term employed within the popular lexicon and is in common usage. Individuals who carry BB guns are not considered to be armed with firearms. BB gun owners are not required to possess court cards. BB gun owners can purchase BB guns over the counter and they're not subject to background checks like someone purchasing a firearm would. Moreover, even if the trial court should have to respond to issued instruction on the definition of firearm, this was not plain error. The omission of jury instruction rises to level of plain error only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law. So as to severely threaten the fairness of the trial. In the prosecutor's closing argument, as I stated previously, he stated, if you are not convinced beyond a reasonable doubt that this is in fact a real firearm, that's why the robbery count is there. The jury knew that if they believe co-defendant's weapon to be a BB gun, they should convict him of robbery. Therefore, this simply cannot constitute plain error. For these reasons and the reasons stated in the people's brief, the people respectively request that this honorable court affirm defendant's conviction for armed robbery. Thank you. If I could just make a couple of points, I think as far as the unavailability of this witness, this judge made it crystal clear he was not going to let this testimony come in and Mr. Morgan made it crystal clear he was not going to testify. So to recall Detective Lee or to recall Detective Lynch and ask him a question that had already been told specifically, it's not coming in, I don't think would have, was necessary. And especially, in fact, before the trial, Mr. Morgan's attorney said he's not going to testify, he's going to plead the fifth. The trial court specifically told Mr. Wright he's going to exercise his right to remain silent. I think it was clearly demonstrated unavailability. And then he tried to call him and he exercised his right. So your position would be during the sidebar, that's what you're referring to, during the sidebar when the prosecutor said, well, if he wants to call Mr. Morgan, he can try. And the judge said, yeah, that's right. I'm paraphrasing the words, but that's what you're saying at that point, the defendant could have rightly taken that as a ruling that he cannot introduce this evidence? Is that your point? Is that why you would say he didn't, in his case in chief, try to put this in? Well, he did call Mr. Morgan, and Mr. Morgan pled the fifth. Okay. No, but he's asking about subsequent. Yeah, so Lynch, Lee, why he didn't put on any of that, try to put that in. Well, he questioned Detective Lee, and the state objected. And then they said it's not, his testimony about anything with Mr. Morgan is not coming in. And so at that point, you know, I don't think that it would have been an exercise in futility to say, oh, I'm going to call Mr. Lee to get in what you already told me is not coming in. But wasn't Detective Lee's testimony prior to Morgan taking the fifth? It was. I mean, it was after Mr. Morgan's attorney said Morgan was going to take the fifth. Right. But you're saying either way, in defendant's mind, it's that if I even tried to recall him, he's going to get slapped because the judge already told me it's not coming in. Yes. I think in the defendant's mind, in the court's mind, in the state's attorney's mind, everyone there was like, this isn't coming in. So I'm, you know. And I think also with regards to the corroboration in this case and the BB gun, I mean, this is clearly corroborated. This was clearly reliable. Tenney says corroboration need not be stringent. If it's close, it comes in. I'd like to just briefly. But hasn't that changed by 804 being changed in 2011? In that I don't think that it's changed. I think it closed the door as to police officers. In, well. Meaning as to reliability. Who can be considered reliable? I'm not sure. Go ahead. Well, I was going to say, but this is a due process, right? By the form of the U.S. Supreme Court says that these have to come in where justice requires. So I don't know that any rule of evidence could ever. They rule with them. Well, I think. That's all I'm trying to point out. Is this a due process issue or is this an admissibility issue? Well, it's the Supreme Court said in chambers that in certain cases it's a due process. You have a due process right to present a full defense. And therefore mechanical adherence to rules of evidence. If that denies a defendant a right to present a full defense. Hang on, hang on. So then any time that the defendant in presenting his or her case in chief attempts to present evidence that would exculpate them in essence their defense and there's an evidentiary ruling with respect to admissibility, then it rises to the level of a constitutional issue as opposed to an evidentiary ruling? Well, I mean, I think that I can't say in every case. I understand what you're getting at. But I think it's clear that if it's something that's necessary for your defense, which in this case on the firearm element this was very necessary for his defense. That's exactly what chambers was. The Mississippi rules of evidence would not allow, I hope I got that state right, would not allow the witness to impeach an attorney to call a witness to impeach his own witness. And so it was like the jury never heard that this other person had confessed to the crime. And they said that's a due process violation of a right to present a full defense. I'd just briefly like to get to the state repeatedly said with respect to the instruction issue that a firearm is not an element of this offense. Under Apprendi, any element that raises the minimum sentence, which this does, this changes it from 6 to 21 minimum sentence, is an element of the offense that must be proven beyond a reasonable doubt. So this is an element. And the idea that everyone just knows what's included in the definition of a firearm, I think, is belied by that there's a criminal pattern jury instruction that specifically addresses this and says here's what a firearm is, here's what a firearm isn't. When appropriate, you must tell the jury what a firearm is and what it isn't. And I think in this case, it clearly was appropriate. And the fact that the jury ---- I'm sorry, but on plain error review, the case law has made a distinction between the failure to instruct on an element of the offense, which is clearly going to be plain error virtually always, and the failure to instruct on a definition that's corollary to the elements. Well, I think so, but I think ---- Do you agree with that? Yes, Your Honor. But I think if it's a contested element where the definition is necessary. So, like, if you look at People v. Delgado, that was an instruction to one of the definitions within that element. And the defense counsel didn't request the instruction, but they still reversed, because it was necessary for the jury to make their determination that they be instructed on the definition of that element. It was defendant's position that this was a BB gun and, therefore, it wasn't a firearm. Did defendant ever attempt to tender an instruction with respect to the definition of firearm? No, defendant did not. And I understand that would normally result in forfeiture. But if you look at Delgado, Fonda, and Stromblin, which are cited in the briefs, those are all cases where, in some instances, if it relates to a contested element of the offense, it is an error to not instruct on the definition. And I think this case ---- Did he, on the question of whether it was contested, did he even raise this in his closing argument? Did he ever say, even if I did do it, it was a BB gun? I mean, his argument to the jury was, it wasn't me, right? Yes, Your Honor, it was. But I still think the judge had a duty, because he did get in the evidence at least enough through Detective Lee that this BB gun was found and that it could have been. And so that was clearly a part of his defense. And, you know, perhaps he wanted to focus on something in closing, and, you know, I think he was maybe going for an all or nothing, and it backfired on him. But I do think in this situation, because this was a contested element where the definition was crucial to an element that greatly enhances the sentence, that changes the crime, that the court should have sua sponte instructed the jury on that element. And are there no further questions? I have a question on the first issue. Do you agree that the ---- Whatever the trial court may or may not have done, do you agree that the trial court was under no obligation to re-admonish the defendant after the conviction? I think that the trial court would have been under no obligation, but the trial court in this case started. He said, do you want to go pro se? I believe he said, you can have an attorney if you want. And Mr. Wright said he wanted to go pro se again. And he was never given any more admonishments after that. And so I think at that point, when he said, once again, offered an attorney and he waved again, he should have given correct admonishments with the sentencing range. But you would agree that he didn't have to do that? He could have said nothing and there would have been no error. He could have said nothing and it would have been a continuing waiver. Although in this case, I mean, I think there's other elements that would have still been required the judge to admonish in this case. Because if you look at people in Cleveland, they'll say if there's an inordinate long time between the original admonishments and sentencing, which in this case was 19 months, so I think that would be an independent factor that would have required admonishments. But regardless of that, when he just, once again, started to admonish, then he should have given a full admonishment to make sure that, once again, his waiver was knowingly wrong. But that's not what the Baker case says. Which case? Baker. Baker. I don't remember the exact facts of the continuing waiver in Baker. It said that it was sufficient. They didn't have to re-admonish. Well, right, I guess I don't think you have to re-admonish unless there's an inordinate amount of time. I don't know the time. Here it was only 82 days. But it was 19 months from the original admonishment to the sentencing hearing. Well, I don't know. We've got a conflict in the briefs. One says 82 days. Eighty-two days from the time he was admonished to the sentencing hearing? I don't recall that. I'll have to, I added it up and it came to 19 months, so. That's still not unusual. Well, I think it's a long time to, you know, completely not admonish someone. It's not an unusual length of a trial, but. So I guess I would say that if Baker says you don't have to re-admonish, yes, in some circumstances you don't. But if you start to, then you need to actually fully admonish. You can't just say, well, you have a right to an attorney if you want one, especially in this case where the previous admonishments were incorrect. And so I don't think incomplete admonishments corrects faulty admonishments. So if there are no further questions. Thank you very much. Both of you were very enjoyable and very good at what you did, and the briefs were very good. So we appreciated your fine work. Thank you, Your Honor. Thank you for your time.